**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: UNASSIGNED**

```
-----------------------------------------------------------------X
XANTREX LLC,                                          :
                                                      :
              Plaintiff,                              :
   v.                                                 :    Case No. 26-2902
                                                      :
UNITED STATES,                                        :
                                                      :
Defendant.                                            :
                                                      :
-----------------------------------------------------------------X
```

## COMPLAINT

Plaintiff Xantrex LLC, by and through its undersigned counsel, for its Complaint against Defendant, the United States, alleges as follows:

1.      This action contests a country-of-origin determination by U.S. Customs and Border Protection ("CBP" or "Customs"). Xantrex imported certain electrical inverters, battery chargers, and inverter/chargers, which it declared to be products of Hong Kong. Upon liquidation, CBP instead treated the merchandise as a product of the People's Republic of China and, on that basis, assessed additional duties of 25 percent *ad valorem* under Section 301 of the Trade Act of 1974 and subheading 9903.88.03, HTSUS. The merchandise is assembled in Hong Kong from components and unfinished printed circuit boards that, as imported into Hong Kong from China, are incomplete and non-functional. Through extensive manufacturing and assembly operations performed in Hong Kong, those components are substantially transformed into finished, functional products having a new name, character, and use. Because the merchandise last underwent a substantial transformation in Hong Kong, its country of origin is Hong Kong and it is not subject to the Section 301 duties that the agency assessed. Xantrex timely protested the agency's

determination; the protest was denied; and Xantrex now brings this action to set aside that determination and to recover the duties unlawfully assessed.

## JURISDICTION AND STANDING

2.      This is a civil action contesting the denial of a protest. The Court has exclusive subject-matter jurisdiction pursuant to 28 U.S.C. § 1581(a).

3.      Plaintiff Xantrex LLC ("Xantrex") is the importer of record of the merchandise covered by the entry at issue and is the party that filed the protest whose denial is contested in this action. Plaintiff therefore has standing to commence this action under 28 U.S.C. § 2631(a).

4.      All liquidated duties, charges, and exactions were paid prior to the commencement of this action. *See* 28 U.S.C. § 2637(a).

5.      This action is timely. Plaintiff filed Protest No. 280923110395 on August 4, 2023, within 180 days of the July 7, 2023 liquidation of the subject entry. CBP denied the protest on March 2, 2026, and Plaintiff commenced this action within 180 days of that denial. *See* 28 U.S.C. § 2636(a).

## THE PARTIES

6.      Plaintiff Xantrex LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Elkhart, Indiana. Xantrex is engaged in the manufacture and importation of power products that provide auxiliary and emergency power, and acted as the importer of record for the entry at issue in this action.

7.      Defendant is the United States. The actions challenged in this Complaint were taken by U.S. Customs and Border Protection ("CBP" or "Customs"), a component of the U.S. Department of Homeland Security.

2

**THE CONTESTED ENTRY AND PROTEST**

8.     On August 16, 2022, Xantrex entered the subject merchandise into the United States at the Port of San Francisco, California (Port Code 2809), under Entry No. 23179782194, declaring the country of origin of the merchandise to be Hong Kong.

9.     The subject merchandise consists of electrical inverters, battery chargers, and inverter/chargers (collectively, the "Devices").

10.     CBP liquidated the subject entry on July 7, 2023, treating the Devices as products of the People's Republic of China ("China"), classifying them under subheading 8504.40.9570, HTSUS, and assessing additional duties of 25 percent ad valorem under subheading 9903.88.03, HTSUS, pursuant to Section 301 of the Trade Act of 1974.

11.     On August 4, 2023, Xantrex timely filed Protest No. 280923110395, contesting CBP's determination that the Devices are products of China and asserting that the Devices are products of Hong Kong and therefore not subject to Section 301 duties. Xantrex sought further review of the protest.

12.     CBP denied Protest No. 280923110395 on March 2, 2026, based on the reasoning set forth in ruling letter HQ H338596 (Feb. 27, 2026).

**THE MERCHANDISE AND ITS MANUFACTURE**

13.     The electrical inverters transform direct current ("DC") electricity stored in batteries into alternating current ("AC") electricity that can be used to power household devices. The battery chargers perform the opposite function, converting AC power from an external source into DC power to charge batteries. The inverter/chargers are equipped to perform both functions.

14.     The Devices are manufactured from components sourced from several countries through production operations performed in both China and Hong Kong.

15.    In China, bare printed circuit boards are fabricated and partially populated with certain components through surface-mount technology ("SMT") and automated-insertion processes. The boards exported from China are incomplete and nonfunctional, as CBP itself acknowledged in denying the protest. *See* HQ H338596 at 9 (acknowledging that "the motherboard PCBA produced in China were not yet fully functional"). In the condition in which they are exported from China, the boards cannot perform any of the electrical-current conversion functions of a finished Device.

16.    The unfinished boards are packaged with additional components and shipped to Hong Kong. There, they are completed into  finished printed circuit board assemblies and subsequently incorporated into the finished Devices.

17.    In Hong Kong, the Devices undergo extensive electromechanical manufacturing and assembly operations that complete the printed circuit board assemblies and transform the imported components into finished Devices. These operations involve numerous discrete components, multiple successive manufacturing steps, skilled labor, dedicated workstations, and specialized production equipment.

18.    First, numerous additional components—including resistors, resonators, displays, fuses, insulators, heatsinks, and switches—are inserted into the boards through a through-hole (or "stuffing") assembly process.  The components are then permanently affixed through wave soldering, during which the boards pass over a wave of molten-solder to form the required solder joints. Further components—including LED displays and indicator lights, transistor clamps, and connectors—are then installed and secured through a separate hand-soldering process. Collectively, these operations populate and complete the printed circuit board assemblies, including the motherboard assembly that controls the conversion of electrical current.

19.     The completed printed circuit board assemblies are then programmed with operating firmware and subjected to in-circuit testing. Only after programming and testing are the assemblies integrated with the remaining components—including AC/DC power adapters, fuses, cables, connectors, a fan, a chassis, and a cover—to produce the finished and functional Devices. Each completed Device then undergoes final functional testing before being packaged and exported to the United States.

20.     The operations performed in Hong Kong are neither  minor nor simple assembly operations. They constitute substantial manufacturing processes  necessary to create functional electrical inverters, battery chargers, and inverter/chargers from components that, as imported into Hong Kong, are incapable of performing any of those functions.

21.     As exported from China, the boards do not bear the name of an "electrical inverter," "battery charger," or "inverter/charger"; none has the character of a finished, ready-to-use electrical inverter, battery charger, or inverter/charger; and none can perform the electrical-current conversions of an electrical inverter, battery charger, or inverter/charger. The name, character, and use of the finished Devices are imparted only through the operations performed in Hong Kong.

### COUNT I — ERRONEOUS DETERMINATION OF COUNTRY OF ORIGIN

22.     Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

23.     For purposes of determining whether merchandise is a "product of China" subject to duties under Section 301 of the Trade Act of 1974, CBP applies the "substantial transformation" test. Where an article is produced from materials or components in more than one country, its country of origin is the last country in which it underwent a substantial transformation.

24.     A substantial transformation occurs when, as a result of manufacturing or processing, an article emerges having a name, character, or use different from that of the materials or components

from which it was made. *See Anheuser-Busch Brewing Ass'n v. United States*, 207 U.S. 556, 562 (1908) ("There must be transformation; a new and different article must emerge, 'having a distinctive name, character, or use.'"); *Torrington Co. v. United States*, 764 F.2d 1563, 1568 (Fed. Cir. 1985) ("a substantial transformation occurs when an article emerges from a manufacturing process with a name, character, or use which differs from those of the original material subjected to the process").

25.    The test is disjunctive: a change in any one of the three criteria—name, character, or use—is sufficient to effect a substantial transformation. *See Koru N. Am. v. United States*, 701 F. Supp. 229, 234 (Ct. Int'l Trade 1988); *Cyber Power Sys. (USA) Inc. v. United States*, 560 F. Supp. 3d 1347, 1353 (Ct. Int'l Trade 2022) ("It is a disjunctive test; only a change in one of the three criteria—name, character, or use—is required.").

26.    This Court has squarely rejected the contention that the country of origin of merchandise of this kind is determined by where its printed circuit board assembly is made. In *Cyber Power*, which likewise concerned electronic devices incorporating a PCBA, the Court rejected the Government's effort to fix origin by focusing on the PCBA and applying an "essence" or "critical component" test, holding that such an approach is "without merit" and "may well undermine the objective of the 'substantial transformation' test, namely to focus on a change in name, character, or use." *Cyber Power*, 560 F. Supp. 3d at 1354. The proper inquiry is whether the article, as a whole, acquired a new name, character, or use—not whether a single component originated in a particular country.

27.    CBP's determination here is more flawed still than the position the Court rejected in *Cyber Power*. In *Cyber Power*, the printed circuit board assembly on which the Government sought to rest origin was a finished PCBA produced in the country claimed to be the country of origin. Here,

by contrast, no finished printed circuit board assembly is produced in China at all. As CBP itself acknowledged, the boards exported from China are not yet functional, and they are completed into finished printed circuit board assemblies only in Hong Kong. CBP nevertheless treats those incomplete, non-functional boards as dispositive of origin. In doing so, CBP allows an unfinished printed circuit board assembly—an article that is not itself a finished PCBA and that cannot perform any function of a finished Device—to drive the country-of-origin determination, contrary to *Cyber Power* and to the name, character, or use test.

28.    The Devices undergo a substantial transformation in Hong Kong. The components and partially-assembled boards imported into Hong Kong are there transformed into new and different articles of commerce—finished electrical inverters, battery chargers, and inverter/chargers—having a name, character, and use distinct from the components and boards from which they are made.

29.    The finished Devices have a *name* different from that of any of their components, including the printed circuit board assemblies. The components from which a Device is made are known in the trade by their own names—such as unfinished printed circuit boards, resistors, capacitors, diodes, switches, displays, fuses, and connectors—whereas the finished Devices that result from the operations in Hong Kong are known by wholly different names: an "electrical inverter," a "battery charger," or an "inverter/charger."

30.    The finished Devices have a *character* different from that of their components. They are finished, ready-to-use products dedicated to specific real world applications and functions; whereas their components—including the incomplete boards imported from China—are not and have no application or function.

31.    The finished Devices have a *use* different from that of their components. The boards imported from China are non-functional and cannot perform any of the electrical-current conversions that the finished Devices perform. That use is imparted only in Hong Kong, and only by virtue of the completion there of the printed circuit board assemblies—via the through-hole insertion and soldering of numerous additional components, including switches, displays, and connectors, and the subsequent programming of operating firmware and in-circuit testing. Only once the Hong Kong-finished printed circuit board assemblies are complete can the manufacture and assembly of the Devices themselves be carried out, through the integration of those assemblies with the chassis, cover, power adapters, cabling, fan, and remaining components. And only once a finished Device has been completed can its intended use be achieved—namely, in the case of the inverters, the conversion of DC electricity stored in batteries into usable AC electricity; in the case of the battery chargers, the conversion of AC electricity from an external source into DC electricity to charge batteries; and, in the case of the inverter/chargers, both.

32.    The components imported from China undergo a complex and meaningful physical change in Hong Kong, where additional components are inserted and soldered to complete the printed circuit board assemblies, and the completed assemblies are combined with the chassis, cover, power adapters, and other components that comprise the finished Devices.

33.    Because the Devices last underwent a substantial transformation in Hong Kong, their country of origin is Hong Kong, and they are not products of China subject to additional Section 301 duties under subheading 9903.88.03, HTSUS.

34.    CBP's determination that the Devices are products of China, and its denial of Protest No. 280923110395, are erroneous and contrary to law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

(a) enter judgment in favor of Plaintiff;

(b) determine that the subject merchandise is a product of Hong Kong and is not subject to additional duties under subheading 9903.88.03, HTSUS;

(c) order Defendant to reliquidate the subject entry as a product of Hong Kong and to refund all duties assessed under subheading 9903.88.03, HTSUS, together with interest as provided by law; and

(d) grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

NEVILLE PETERSON LLP
*Counsel for Plaintiff Xantrex LLC*

/s/ Richard F. O'Neill
Richard F. O'Neill
NEVILLE PETERSON LLP
701 Fifth Ave., Ste. 4200-2159
Seattle, WA 98104-4089
(206) 905-3648
roneill@npwny.com

/s/ John M. Peterson
John M. Peterson
Patrick B. Klein
NEVILLE PETERSON LLP
One Exchange Plaza at 55 Broadway
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Dated: July 22, 2026